**LITVAK MEAT COMPANY, Plaintiff-Appellant,**

**v.**

**George P. BAKER et al., Defendant-Appellee,**

**and**

**Scott Truck Line, Inc., a Nebraska Corporation, Defendant-Appellant.**

**No. 453–70.**

United States Court of Appeals, Tenth Circuit.

July 12, 1971.

Harold A. Feder, Denver, Colo., for plaintiff-appellant.

Douglas McHendrie, Denver, Colo., for defendant-appellee.

Roger Sollenbarger, Denver, Colo., for defendant-appellant.

Before LEWIS, Chief Judge, and ALDISERT * and BARRETT, Circuit Judges.

ALDISERT, Circuit Judge.

Four claims for damage to fresh meat shipments were brought by a shipper against two common carriers, the Penn Central Railroad and the Scott Truck Lines. Following a motion by the railroad to quash service on the grounds that the minimum contacts required for *in personam* jurisdiction in Colorado were

* Of the Third Circuit, sitting by designation.

not present, the claims against Penn Central were dismissed. This appeal by both the shipper and the motor truck carrier [1] presents three separate questions of jurisdiction:

(1) Whether Penn Central met the appropriate tests of doing business in Colorado to make it there amenable to service of process in a diversity suit based on negligence;

(2) Whether the alleged amount in controversy meets the statutory requirement in diversity cases. 28 U.S.C. § 1332;

(3) Alternatively, whether liability of a carrier for damage to an interstate shipment is governed exclusively by the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11), thus immunizing Penn Central from suit in Colorado because it does not operate a line of railroad in that state.

The complaint charged that plaintiff delivered the chilled meat to Scott in Adams County, Colorado, where it was placed in Scott's trailers and thence trucked to Chicago, Illinois, where the trailers were placed in Penn Central's flatcars for shipment east; that the meat arrived at its destination in a "tainted, sour, or putrid condition," (first claim), "partially frozen" (second claim); "dark in color, sticky in places, dull in appearance," (third and fourth claims). Both defendants were charged with negligence in failing to provide the meat with proper refrigeration facilities while in transit (all claims); the railroad with use of defective flatcars and improper shifting thereof resulting in delivery delays (third and fourth claims). Although each claim sounded in negligence based on diversity jurisdiction against both defendants, it was additionally averred that plaintiff "relies in part" upon provisions of the Carmack Amendment and that the parties "have in their possession copies of all relevant documents relating to the subject matter of this claim including [*inter alia*] the uniform order bill of lading."

## I.

The first question is whether the district court erred in finding insufficient contacts in Colorado to render Penn Central amenable to service in that state. From affidavits filed in support of the railroad's motion to dismiss under Rule 12(b) and answers to interrogatories, it appears that Penn Central maintains a Denver, Colorado, office, which is listed in both the white and yellow pages of the telephone directory and is staffed by three employees—a district sales manager, a sales representative, and an office manager—who from there solicit business for the company in Colorado, Wyoming and Utah. In addition, the Denver staff keeps records, charts Colorado business trends and conditions, and responds to inquiries relating to company services, including routings, rates, movements, and handling of freight. Office rent and staff salaries are paid by the railroad company, which also sends its vice-president and vice-president in charge of sales several times a year to visit Colorado on business. The railroad has 399 clients or accounts located in Colorado. Approximately 9,000 freight cars annually originate in that state destined for Penn Central carriage. Personal property taxes are paid by the railroad to the City and County of Denver.

There is formidable authority for the proposition that in diversity cases, state law determines whether a corporation is subject to process in the state and that federal decisions are important only in ascertaining whether the state law is within constitutional bounds. Arrowsmith v. United Press International, 320 F.2d 219 (2 Cir., 1963).[2] In *Arrowsmith*, the majority of the court, *en banc*, adopted the view originally propounded by

---

1. Also dismissed was a cross-claim of Scott Truck Line against Penn Central for liability over.

2. Judge Friendly spoke for the majority in this classic debate; Judge Clark, one of the leading architects of the Federal

Judge Goodrich of the Third Circuit,[3] and overruled Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2 Cir. 1960), which had proclaimed a federal standard. *Jaftex* still commands the support of many commentators.[4]

We do not perceive this interesting procedural question to remain open in this circuit. In Walker v. General Features Corp., 319 F.2d 583, 585 (10 Cir. 1963), the court, speaking through Judge Hill, said that the question of "doing business" must "be resolved by application of state or local law rather than federal law." Moreover, the resolution of the state-federal issue would not be necessitated in the instant case because we are not convinced that there is a basic distinction between Colorado's liberal jurisdictional tests, Vandermee v. District Court, 164 Colo. 117, 433 P.2d 335 (1967); White-Rodgers v. District Court, 160 Colo. 491, 418 P.2d 527 (1966), and the landmark due process decisions of the Supreme Court, properly regarded also as expressions of federal amenability-to-process policy. Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[5]

Upholding jurisdiction under Colorado's long arm statute in *Vandermee,* the court found minimum contracts present when a foreign corporation, though neither maintaining a sales office nor conducting direct sales within Colorado, nevertheless had a distributor who "has set up channels of sales promotion and distribution in Colorado for the purpose of selling products in Colorado." Likewise jurisdiction was held to lie in *White-Rodgers,* where an agent maintained a company office in his home, listed his home telephone as that of his

---

Rules of Civil Procedure, dissented. The majority buttressed its position by quoting Hart and Weschsler, The Federal Courts and the Federal System, 1953, p. 959, "Rule 4(d) (3) of the Rules of Civil Procedure tells how service of process is to be made upon a corporation which is subject to service; but it does not tell when the corporation is so subject." See National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L. Ed.2d 354 (1964), and cases cited in 4 Wright and Miller, Federal Practice and Procedure, § 1075 n. 50; Note, In Personam Jurisdiction of the Federal Courts Over Foreign Corporations in Diversity Cases: State versus Federal Law under Erie R.R. v. Tompkins, 38 St. John's L.Rev. 327 (1964). See also ALI Study, pp. 133–134.

3. Pulson v. American Rolling Mill Co., 170 F.2d 193 (1 Cir. 1948), Goodrich, J., sitting by designation.

4. *See* Comment, Federal Jurisdiction Over Foreign Corporations and the Erie Doctrine, 1964, 64 Col.L.Rev. 685; Comment, Personal Jurisdiction Over Foreign Corporations in Diversity Actions: A Tiltyard for the Knights of Erie, 1964, 31 U. Chi.L.Rev. 752; Note, Diversity Jurisdiction of the Federal Courts Over Foreign Corporations, 1964, 49 Iowa L.Rev.

1224; Note, Corporate Amenability to Process in the Federal Courts: State or Federal Jurisdictional Standards: 1964, 48 Minn.L.Rev. 1131. See also Comment, Choice of Law in the Federal Courts: Use of State or Federal Law to Determine Foreign Corporation's Amenability to Suit, 1964 Duke L.J. 351.

> Professor Moore is critical of the result of *Arrowsmith,* claiming the decision "is a scholastic attack upon diversity, and diversity deserves juristic support so long as it is on the books; may prove troublesome relative to bulge service under Rule 4(f); and will prove divisive and troublesome where plaintiff's action contains a federal claim and a non-federal claim, whether or not this latter claim is supported by pendent jurisdiction or solely by diversity. * * * Sound judicial administration is furthered by *Jaftex* and undermined by *Arrowsmith.*" 2 Moore, Federal Practice ¶ 4.25 [7], at 1183 (2d ed. 1965).

Forrester, Federal Jurisdiction and Procedure, Casebook Series, (Second Edition, 1970) at 603.

5. Similarly, Judge Murrah found no distinction between Oklahoma and federal concepts of "doing business" in Steinway v. Majestic Amusement Co., 179 F.2d 681 (10 Cir. 1949).

company's, solicited orders and forwarded correspondence in furtherance of his company's interest. Indeed, the Colorado Supreme Court has expressly emphasized the liberality of the state's jurisdictional policy in Safari Outfitters v. Superior Court, 167 Colo. 456, 448 P.2d 783, 784 (Colo.1968): "By enacting the [long arm] statutes our legislature intended to extend the jurisdiction of our courts to the fullest extent permitted by the due process clause of the fourteenth amendment to the United States Constitution." [6]

■ We are persuaded that the facts presented in the instant case amply met the tests of *Vandermee* and *White-Rodgers* under a state amenability-to-process standard coextensive with federal standards and constitutional due process tests. We hold that the district court erred in its conclusion that there were insufficient minimal contacts to subject Penn Central to service of process.

## II.

■ Apart from its attack on jurisdiction over the person, Penn Central advances a second contention designed to defeat subject matter jurisdiction. It argues that since the complaint consists of four separate claims, not one of which exceeds $10,000,[7] plaintiff failed to meet the amount in controversy requirement of 28 U.S.C. § 1332.[8] In contending that a single plaintiff bringing a multi-count complaint in a diversity action may not aggregate claims to satisfy this requirement, Penn Central seems to be arguing against a proposition that appears to have the persuasion of settled law both in this circuit, Kimel v. Missouri State Life Ins. Co., 71 F.2d 921 (10 Cir. 1934), and elsewhere.[9] In Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the landmark case prohibiting the aggregation of claims by two or more plaintiffs, even members of a class, the court was careful to observe: "Aggregation has been permitted * * * in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant. * * *" Professor Wright comments: "If a single plaintiff is suing a single defendant, Rule 18 permits the plaintiff to join as many claims as he may have against the defendant, regardless of their nature, and the value of all the claims is added together in determining whether the jurisdictional amount is met," Wright, at 121. The only distinction between this principle and the instant case is that here there is a single plaintiff and two defendants. We perceive this to be a distinction without a difference where, as here, liability is asserted against both defendants in all four claims. We accept the conclusion reached in Siegerist v. Blaw-Knox Co., 414 F.2d 375, 381 (8 Cir. 1969), that the claims "were

---

6. Although articulating this standard, the court nevertheless declined to find jurisdiction in *Safari Outfitters*. The defendant maintained no office in the state, had no personnel to solicit sales, but had advertised in a national magazine which prompted a Colorado resident to request information by mail. The company responded by mailing brochures, participating in telephone calls, and received a check from the resident drawn on a Colorado bank for services rendered.

7. First count, $9,806.29; second count, $2,809.86; third count, $2,286.84; fourth count, $1,103.61.

8. 28 U.S.C. § 1332(a);
   The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs * * *.

9. Wright, Law of Federal Courts, § 36, "Aggregation of Separate Claims" at 121, citing Crawford v. Neal, 144 U.S. 585, 12 S.Ct. 759, 36 L.Ed. 552 (1892); Lemmon v. Cedar Point, Inc., 406 F.2d 94 (6 Cir. 1969); Stone v. Stone, 405 F.2d 94 (4 Cir. 1968); Pearson v. National Soc. of Public Accountants, 200 F.2d 897 (5 Cir. 1953); and cases cited in 1 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.), § 24 n. 56.4.

pressed against the [defendants] jointly and the aggregate value of these claims is the proper measure for determining jurisdiction under 28 U.S.C. § 1332(a). 1 Moore's Federal Practice, ¶ 0.97 [2] (2d ed. 1964)."

10. 49 U.S.C. § 20(11):

*Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim.* Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other *limitation of any character whatsoever* shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representa-

### III.

For its final argument Penn Central presents a second attack on jurisdiction over the person, contending that the Carmack Amendment to the Interstate Commerce Act [10] has preempted other

tion or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void: *Provided,* That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by the bill of lading of the carrier by water and by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water: *Provided,* however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the *Interstate Commerce Commission* to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this title; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the commission is empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term "ordinary livestock" shall include all cattle, swine, sheep, goats, horses,

substantive law in this field, and that, under its provisions, Penn Central may not be subject to process in Colorado because it does not operate a line of railroad in that state.[11]

It is settled that the Carmack Act is constitutional, Atlantic Coast Line v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911), that it supersedes any state legislation on the same subject, Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913) and that any "rule, regulation, or other limitation of any character whatsoever" purporting to limit its effect are by its terms declared null and void, Missouri Pacific R.R. v. Elmore and Stahl, 377 U.S. 134, 136, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964).

Relying on certain language contained in these cases, Penn Central advances the sweeping suggestion that no action may be brought against a railroad for damage to an interstate shipment except under the provisions of this act. It anchors its contention on such statements

as "the liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions. The Carmack Amendment (1906) makes carriers liable." Missouri Pacific, supra, 377 U.S. at 137, 84 S.Ct. at 1144.

■ The railroad reads too much into the language of the decisions and the statute. By its very terms the statute did not intend to preempt every cause of action brought by a shipper against a carrier for damage to its interstate shipment. The Carmack Amendment was not designed as a comprehensive restatement of the law, redefining with encyclopedic breadth and detail all rights and responsibilities of interstate freight shippers and carriers. Rather, the Act confines itself to a statement of the rights of a legal holder of a receipt or bill of lading issued by a carrier upon receiving property for interstate transportation and the responsibilities of a carrier to such holder. The Act requires a "common carrier, railroad, or transportation company" to is-

and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses: *Provided* further, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: *Provided* further, That all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought, and may be maintained, if in a district court of the United States, only in a district, and if in a State court, only in a State through or into which the defendant carrier operates a line of railroad: *Provided* further, That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation, or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice: And *provided* further, That for the purposes of this paragraph and of paragraph (12) of this section the delivering

carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: And *provided* further, That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided. Feb. 4, 1887, c. 104, Pt. I, § 20, 24 Stat. 386; June 29, 1906, c. 3591, § 7, 34 Stat. 593; Mar. 4, 1915, c. 176, § 1, 38 Stat. 1196; Aug. 9, 1916, c. 301, 39 Stat. 441; Feb. 28, 1920, c. 91, §§ 436–438, 41 Stat. 494; July 3, 1926, c. 761, 44 Stat. 835; Mar. 4, 1927, c. 510, § 3, 44 Stat. 1448; Apr. 23, 1930, c. 208, 46 Stat. 251; Aug. 9, 1935, c. 498, § 1, 49 Stat. 543; Sept. 18, 1940, c. 722, Title I, § 13(b), 54 Stat. 919.

11. * * * all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought, and may be maintained, if in a district court of the United States, only in a district, and if a State Court, only in a State through or into which the defendant carrier operates a line of railroad.

sue such receipt or bill of lading and makes the carrier, with certain exceptions not pertinent here, liable to such holder "for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered * * * notwithstanding any limitation of liability" imposed by "contract, rule, regulation, or in any tariff" filed with the Interstate Commerce Commission or promulgated by state law. *Adams Express Co., supra.*

It explicitly provided that "nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law." This court has held that "[t]he Carmack Amendment does not change the common law rule." L. E. Whitlock Truck Service, Inc. v. Regal Drilling Co., 333 F.2d 488, 491 (10 Cir. 1964), and that it "continues in effect the common law applicable to the liability of carriers.".

In *Whitlock,* 333 F.2d at 491, this court summarized the liability of a carrier at common law:

> At common law a common carrier undertook to carry the shipment safely, and it was liable for all loss or injury excepting only that due to acts of God, public enemy, and those arising from the inherent nature of the goods transported or resulting from the fault of the shipper. It was also a rule of common law that as to these excepted causes of damage the carrier could nevertheless be held liable if it were negligent. The carrier was liable for damages whether negligent or not if the loss was not due to the excepted causes. Therefore a carrier could not escape liability by a showing of the absence of negligence on its part. Chesapeake & Ohio Ry. Co. v. Thompson Mfg. Co., 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 659.

Despite this seemingly tractable burden of proof, a shipper was nonetheless exposed to peculiar problems when more

than one carrier was used, since he was frequently unable to prove that his loss occurred while the goods were in the possession of a particular carrier. See Atlantic Coast Line v. Riverside Mills, 219 U.S. 186, 199–203, 31 S.Ct. 164, 55 L.Ed. 167 (1911). Thus, in addition to codifying the common-law rule of liability, the Carmack Amendment was enacted to eliminate from a shipper's burden of proof the often insurmountable hurdle of demonstrating damage at the hands of a specific carrier. N.Y. Philadelphia & Norfolk R. Co. v. Peninsula Produce Exchange, 240 U.S. 34, 37, 36 S.Ct. 230, 60 L.Ed. 511 (1916). As we said in *Whitlock, supra,* 333 F.2d at 490, "its principal function is to *permit* a shipper in interstate commerce to bring an action against the initial carrier to recover for damages to the shipment whether such damages occurred while the goods were in the hands of the initial carrier or connecting carriers." (Emphasis supplied.)

Thus, though the Carmack Amendment allows a shipper to enjoy the elimination of this one element in his burden of proof, it does not compel him to avail himself of the opportunity. The more difficult road of common-law action against a carrier is still open to a shipper wishing to traverse it. The common-law action is conceptualized on contractual principles with tort overtones, and is a special refinement of the general law of bailment. However, at common law a bailor has a choice of remedies where a bailee has damaged the bailed property or breached the bailment contract, Green v. Hertz Drivurself System, 130 Colo. 238, 274 P.2d 597 (1954). If, due to the bailee's negligence the bailed property is damaged, the bailor need not proceed *ex contractu.* He may also bring an action in negligence. Burroughs Corp. v. Rocky Mountain Prestress, Inc., 431 F.2d 1185 (10 Cir. 1970). If he chooses to do so, "to establish a prima facie case the bailor need only show that the goods were delivered to the bailee in good condition and that the bailee returned the goods

in a damaged condition," *Burroughs, supra,* 431 F.2d at 1187. This creates a rebuttable presumption of negligence on the part of the bailee: "[t]here is, however, no shift in the burden of proof, which still remains with the plaintiff," Hipps v. Hennig, 167 Colo. 358, 447 P.2d 700, 701 (1968).

█ Thus, the existence of a contractual remedy at common law does not prevent the shipper from bringing an action based solely on negligence. To be sure, in such an action, a greater burden is imposed on the plaintiff, for he must prove more than the fact of damage to the goods in shipment by the defendant; he must also prove that negligence of the defendant was the proximate cause of the damage claimed. To say that such a remedy exists is not to say that it is often utilized by a bailor-shipper against a bailee-common carrier. The relative ease of proving a case in contract, either at common law or under the Carmack Amendment, militates against its use, and is, to be sure, the more practical, available remedy. But here we are not dealing with the practicability of a remedy in negligence or the advisability of using it. Our inquiry is limited to a determination that such a remedy exists, apart from the contractual remedy offered by the Carmack Amendment.

█ We are persuaded, therefore, that while the Carmack Amendment pre-empted state law and made the "liability of a carrier for damage to an interstate shipment * * * a matter of federal law controlled by federal statutes and decisions," in actions based exclusively on the holder of a receipt or a bill ·of lading issued by a common carrier, *qua* holder, Missouri Pacific RR Co. v. Elmore and Stahl, it did not oust all other remedial rights of shippers.

██ Nor does the somewhat awkward averment that "[i]n bringing this action, Plaintiff relies in part, upon the provisions of 49 U.S.C.A. § 20(11)" render the complaint fatally inconsistent. We recognize, of course, that because Penn Central does not maintain lines in Colorado, venue does not lie against it in an action based on the Carmack Amendment.[12] But with two common carriers named as defendants, it is possible that plaintiff intended to proceed against Penn Central in negligence and against Scott Truck Line for breaching duties owed a holder of a receipt or bill of lading.[13] This would be permissible, as would alternative pleadings in negligence against Scott, F.R.Civ.P. 8(a). At this stage of the proceedings in the district court, plaintiff was not required to make an election.

The order of the district court dismissing plaintiff's complaint against Penn Central and the cross-claim of Scott Truck Lines Inc. against Penn Central is reversed.

12. See footnote 11, *supra.*

13. 49 U.S.C. § 319:
The provisions of section 20(11) and (12) of this title, together with such other provisions of chapter 1 of this title (including penalties) as may be necessary for the enforcement of such provisions, shall apply with respect to common carriers by motor vehicle with like force and effect as in the case of those persons to which such provisions are specifically applicable. Feb. 4, 1887, c. 104, Pt. II, § 219, as added Aug. 9, 1935, c. 498, 49 Stat. 563, and amended May 16, 1942, c. 318, § 3, 56 Stat. 300; Aug. 7, 1942, c. 552, § 1, 56 Stat. 746.